UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MACARIO GILBERTO
REYES-HERRERA,

               Plaintiff,                       **DECISION AND ORDER**

        v.                           6:19-CV-06257 EAW

JASON J. FLAITZ, BARBARA M.
CROSBY, and MARCI A. TRIMBLE,

               Defendants.
_____

## <u>INTRODUCTION</u>

Represented by counsel, plaintiff Macario Gilberto Reyes-Herrera ("Plaintiff")
brings this action pursuant to 42 U.S.C. § 1983, claiming that defendants Jason J. Flaitz
("Flaitz"), Barbara M. Crosby ("Crosby"), and Marci A. Trimble ("Trimble") (collectively
"Defendants") violated his Fourth Amendment right to be free of unreasonable seizures
and his Fourteenth Amendment right to equal protection under the law. (Dkt. 1). Pending
before the Court are the parties' competing motions for summary judgment. (Dkt. 45; Dkt.
46). For the reasons set forth below, the Court finds that genuine issues of material fact
preclude summary judgment in favor of any party, and accordingly denies both motions in
their entirety.

## BACKGROUND

### I.    Factual Background

The following facts are derived from Plaintiff's Statement of Undisputed Material Facts submitted in support of his motion for summary judgment (Dkt. 45-45) ("Plaintiff's Statement"), Defendants' Statement of Undisputed Material Facts submitted in support of their motion for summary judgment (Dkt. 46-2) ("Defendants' Statement"), and Plaintiff's response to Defendants' Statement (Dkt. 50-1).

The Court notes that, despite having been granted an extension of time to file a response to Plaintiff's motion for summary judgment over Plaintiff's objection (*see* Dkt. 48; Dkt. 49; Dkt. 51; Dkt. 52), Defendants failed to file any such response, including any response to Plaintiff's Statement.  Local Rule of Civil Procedure 56(a)(2) provides that "[e]ach numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in [an] opposing statement."  Although a district court should not deem unopposed facts to be admitted when those facts are unsupported by the record, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001), a district court has discretion to deem facts admitted for lack of compliance with its local rules, *see N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (it was within district court's discretion to deem the moving party's statement of material facts admitted where the opposing party "offered mostly conclusory denials" and "failed to include any record citations" contrary to the district's local rules); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998) (because plaintiff failed to respond

to defendant's statement of material facts submitted in accordance with local rules, "the material facts contained in his statement are deemed to be admitted as a matter of law"). Accordingly, the Court has accepted as true the facts set forth in Plaintiff's Statement, to the extent they are (1) supported by the evidence of record and (2) not directly controverted by Defendants' Statement and the exhibits submitted in support thereof.  Where a fact is disputed, the Court has noted the same.

### A.   **Defendants' Background and Training**

At the times relevant to the instant action, Flaitz was employed by the New York State Police (the "NYSP") as a trooper assigned to SP North Hornell, Crosby was employed by the NYSP as a trooper assigned to SP Dundee, and Trimble was employed by the NYSP as a sergeant assigned to SP Bath.  (Dkt. 45-45 at ¶¶ 3-5).

Flaitz is a user of social media, and the record reflects that: (1) on November 24, 2018, he shared on his personal Facebook page a video titled "#Refugee Invasion" appearing to show a helicopter above a group of people on the border between Mexico and Guatemala; (2) on December 16, 2018, he shared on his personal Facebook page a video titled "Schumer Confesses" appearing to show former President Donald Trump and Senator Charles Schumer sitting in the Oval Office and discussing Senator Schumer's positions on border security; (3) also on December 16, 2018, he posted a note on Facebook indicating that "Jimmy Carter and the Democratic Party" were responsible for "giving annuity payments to immigrants" and that the Democratic Party have immigrants Social Security payments at age 65 "even though they never payed a dime into it."  (*Id*. at ¶¶ 152-58).  Further, Flaitz "liked" a comment by one of his Facebook friends on the "#Refugee

Invasion" video indicating that "[t]hat chopper should have just fucken shot every one of them fucken assholes."  (*Id*. at ¶ 153).

In the course of their employment with the NYSP, Flaitz, Crosby, and Trimble each completed an official NYSP course entitled "State Police Immigration Law and Policy" in both 2015 and 2017.  (*Id*. at ¶ 6).  This course advised that NYSP troopers have "no authority to take police action for civil immigration law violations," including "identifying, questioning, detaining, or demanding to inspect federal immigration documents."  (*Id*. at ¶ 7).  Instead, NYSP troopers may detain a person only if they determine that there is reasonable suspicion to believe that a person has entered the country unlawfully.  (*Id*. at ¶ 8).  The course further advised that "an individual's failure to produce a driver's license does not provide reasonable suspicion to believe that the person has entered the country unlawfully."  (*Id*. at ¶ 10 (internal quotation marks omitted)).  "At all times relevant hereto, New York State Police policy forbade state troopers from inquiring about a vehicle passenger's immigration status unless there was reason to believe that individual was involved in criminal activity or had committed an infraction."  (*Id*. at ¶ 11).  Further, "[a]t all times relevant hereto, New York State police policy forbade state troopers from taking police action with respect to individuals believed to be 'illegal aliens' unless there was reason to believe that individual was involved in criminal activity or had committed an infraction."  (*Id*. at ¶ 12).  Flaitz disagrees with the NYSP policy "prohibiting New York State Troopers from cooperating with federal officials on civil immigration enforcement."  (*Id*. at ¶ 13).

B.     **Traffic Stop and Arrest**

On the morning of June 29, 2017, Plaintiff, who "presents as a Latino person of color and a native speaker of Spanish," was a passenger in a GMC truck (the "vehicle") operated by his co-worker, Daniel Blauvelt ("Blauvelt"), who "presents as Caucasian and is an English speaker."  (Dkt. 45-45 at ¶¶ 2, 14-15, 18).  A second co-worker, Hector Virgilio Aguilar-Valdez ("Aguilar-Valdez"), who "presents as Hispanic and primarily speaks Spanish," was also a passenger in the vehicle.  (*Id*. at ¶¶ 17, 19).

On that same morning, Flaitz was assigned to work on an overtime seatbelt enforcement detail on New York State Route 54A ("Route 54"), outside of Penn Yan, New York.  (*Id*. at ¶ 21).  At approximately 10:46 a.m., Flaitz observed the vehicle traveling south on Route 54A, and observed that one or more of the occupants was not wearing a seatbelt.  (*Id*. at ¶¶ 22-25).  At his deposition, Flaitz testified that Plaintiff was not wearing a seatbelt when Flaitz first observed him.  (Dkt. 46-3 at 17).  Plaintiff maintains that he was wearing a seatbelt the entire time he was in the vehicle.  (Dkt. 45-2 at ¶ 8).

Flaitz initiated a traffic stop, and the vehicle immediately pulled over to the side of Route 54A.  (*Id*. at ¶¶ 28-29).  Flaitz approached the vehicle and asked Blauvelt, the driver, for his license and registration.  (*Id*. at ¶ 30).  Flaitz further stepped onto the vehicle's running board and observed that Blauvelt and Aguilar-Valdez were not wearing seatbelts, while Plaintiff was.  (*Id*. at ¶¶ 31-32).

Flaitz asked Plaintiff and Aguilar-Valdez for identification.  (*Id*. at ¶ 36).  Plaintiff advised Flaitz that he had a driver's license but was not carrying it on his person.  (*Id*. at ¶ 38).  Plaintiff in fact held a valid New York State driver's license.  (*Id*. at ¶ 39).  Plaintiff

provided Flaitz with his name, address within New York State, and date of birth.  (*Id*. at ¶ 40).  Plaintiff also provided Flaitz with Aguilar-Valdez's name and address, as Aguilar-Valdez was unable to speak English.  (*Id*. at ¶ 41).  In order to obtain this information, Plaintiff spoke to Aguilar-Valdez in Spanish.  (*Id*. at ¶ 42).

Flaitz claims that while he was requesting identification information from Plaintiff and Aguilar-Valdez, he asked them "how they came to the United States" and "they could not provide any information to that fact."  (Dkt. 45-18 at 6).  Plaintiff maintains that when Flaitz asked him his immigration status, he simply told Flaitz that he was "not required to give [Flaitz] [his] immigration status."  (Dkt. 45-2 at ¶ 2).  Plaintiff denies having made any statements to Flaitz about "how, where, or when [he] entered the United States."  (*Id*. at ¶ 19).

Flaitz returned to his patrol car to run records checks on Plaintiff, Blauvelt, and Aguilar-Valdez.  (Dkt. 45-45 at ¶ 44).  Flaitz did not find any open warrants relating to Plaintiff, nor did he discover any additional information requiring further investigation. (*Id*. at ¶ 46).  Flaitz wrote traffic tickets citing Blauvelt for failure to wear a seatbelt and operating a vehicle out of class and citing Aguilar-Valdez for failure to wear a seatbelt. (*Id*. at ¶¶ 47-49).  Flaitz did not cite Plaintiff for any violation of New York's vehicle and traffic law.  (*Id.* at ¶ 50).

When Flaitz returned to the vehicle, he asked Blauvelt to step out.  (*Id*. at ¶ 51). Once Blauvelt was outside the vehicle, Flaitz asked him how he knew Plaintiff.  (*Id*. at ¶ 52).  Blauvelt indicated that he had worked with Plaintiff for "a while" and that he did not believe Plaintiff was "illegal."  (*Id*. at ¶ 53).

At his deposition, Flaitz testified that after he spoke to Blauvelt, he spoke to Plaintiff and Plaintiff told him that he was in the United States illegally. (Dkt. 46-3 at 35). However, Plaintiff denies having made any statements regarding his immigration status to Flaitz. (*See* Dkt. 50-1 at ¶ 7).

Based only on the information he gathered during the traffic stop, Flaitz felt that he had probable cause to believe that Plaintiff was an illegal entrant to the United States. (*Id.* at ¶¶ 54-55). Flaitz then called the U.S. Customs and Border Protection ("CBP") Integrated Border Communications Center in Buffalo, New York, seeking confirmation that Plaintiff was an illegal entrant. (*Id.* at ¶¶ 59-61). CBP Agent Julio C. Leon-Gonzalez ("Leon-Gonzalez") interviewed Plaintiff in Spanish on Flaitz's phone. (*Id.* at ¶ 63). Plaintiff advised Leon-Gonzalez that he was a citizen of Mexico, but declined to answer questions regarding his immigration status. (*Id.* at ¶ 65). Leon-Gonzalez then asked Flaitz to detain Plaintiff until CBP could respond. (*Id.* at ¶ 66). Flaitz testified at his deposition that Leon-Gonzalez advised him that Plaintiff was an illegal entrant. (Dkt. 46-3 at 48). However, Plaintiff denies that Leon-Gonzalez identified Plaintiff as an illegal entrant, noting that CBP records indicate CBP "did not ascertain Plaintiff's past immigration history or obtain records thereof until he was processed at the Rochester Border Patrol Station." (Dkt. 45-45 at ¶ 94; Dkt. 50-1 at ¶ 12).

After speaking to Leon-Gonzalez, Flaitz called Trimble "to ask if he should transport Plaintiff to SP Dundee and request backup to do so." (*Id.* at ¶ 67). Trimble instructed Flaitz to detain Plaintiff and have a local patrol transport him to SP Dundee. (*Id.* at ¶¶ 68-69).

Crosby thereafter responded to the traffic stop, having received a request from state police dispatchers at SP Canandaigua.  (*Id*. at ¶ 70).  Crosby spoke to Flaitz, who described the traffic stop and directed her to take Plaintiff to SP Dundee.  (*Id*. at ¶ 71).  However, Crosby "was not convinced by . . . Flaitz's account of the relevant events."  (*Id*. at ¶ 72).  She accordingly called New York State Police Investigator Diane Trickey ("Trickey"), seeking guidance about how to proceed with Plaintiff's arrest.  (*Id*. at ¶ 73).  Trickey told Crosby to transport Plaintiff to SP Dundee for further investigation.  (*Id*. at ¶ 74).  Crosby then assisted Flaitz in handcuffing Plaintiff and transported him to SP Dundee.  (*Id*. at ¶ 77).

After arriving at SP Dundee, Plaintiff was handcuffed to a fixed surface in the barracks patrol room.  (*Id*. at ¶ 78).  At approximately noon, Trickey called New York State Police Senior Investigator Randy Hugg ("Hugg") and advised him that Flaitz was unsure whether Plaintiff had violated any provision of the vehicle and traffic law.  (*Id*. at ¶ 80).  Hugg told Trickey that Plaintiff had not committed an offense and should be released.  (*Id*. at ¶ 81).  Trickey in turn advised Flaitz and Crosby of the same.  (*Id*. at ¶ 85).  Plaintiff was released from New York State Police custody at approximately 12:40 p.m.  (*Id*. at ¶ 86).

Plaintiff was then approached by CBP in the parking lot outside of SP Dundee and arrested after a brief conversation with Leon-Gonzalez.  (*Id*. at ¶ 87).  Plaintiff was subsequently charged with illegally reentering the United States in violation of 8 U.S.C. § 1326(a), and was convicted of the same.  (*Id*. at ¶ 95; Dkt. 46-2 at ¶ 13; Dkt. 50-1 at ¶ 13).  Plaintiff was sentenced to time served, and was removed from the United States to Mexico

in or about March 2018.  (Dkt. 45-45 at ¶ 96).  Plaintiff is in poor health and has struggled to find work in Mexico.  (*Id*. at ¶ 97).

C.    **State Police Internal Investigation**

In July of 2017, the office of New York State Governor Andrew Cuomo instructed the NYSP to conduct an internal incident review to determine whether Flaitz had violated NYSP policy in arresting Plaintiff.  (*Id*. at ¶ 101).  As part of this investigation, Flaitz was interrogated under oath on July 27, 2017.  (*Id*. at ¶ 102).  During his interrogation, Flaitz indicated that his roadside interview with Blauvelt had given him probable cause to believe that Plaintiff had entered the United States illegally.   (*Id*. at ¶ 103).

The evidence of record suggests that the NYSP internal incident review was performed in a less than forthright manner.  For example, NYSP Zone Sergeant James Feely ("Feely") edited a memorandum authored by Crosby to specifically refer to Plaintiff as an illegal entrant.  (*Id*. at ¶¶ 111-112).  Similar edits were made to a memorandum authored by Hugg, and Hugg confirmed at his deposition that the changes had originated with NYSP supervisors.  (*Id*. at ¶¶ 121-23, 126).

Feely issued a report dated August 30, 2017, finding that Flaitz's actions aligned with NYSP procedures.   (*Id*. at ¶ 132-33).   Feely specifically concluded that the combination of "Blauvelt's statement that Plaintiff was 'less likely' to be illegal, taken together with Plaintiff's inability to 'produce identification' or 'positively identify [himself],' gave . . . Flaitz probable cause to believe that Plaintiff was an illegal entrant." (*Id*. at ¶ 134 (alteration in original)).  Feely's report further indicated that Flaitz had

"verified that a criminal violation of Immigration Law had occurred after consultation with the U.S. Border patrol [sic]." (*Id*. at ¶ 135).

Feely's report was endorsed by NYSP Captain Erik Dauber and NYSP Major Richard Allen in September and November of 2017, respectively. (*Id*. at ¶ 136). However, on November 27, 2017, NYSP Captain Barry Chase ("Chase") sent an email to Feely and others at the NYSP outlining inconsistencies between Flaitz's account of events and several of the memoranda enclosed with the report. (*Id*. at ¶ 137). Chase suggested that additional inquiries be made. (*Id*. at ¶ 138). As a result, Flaitz was asked to draft a memorandum regarding his actions on June 29, 2017, but he refused to do so. (*Id*. at ¶¶ 139-41).

## II. <u>Procedural Background</u>

Plaintiff commenced the instant action on April 5, 2019. (Dkt. 1). Defendants moved to dismiss the case on September 13, 2019 (Dkt. 13), and Plaintiff opposed their motion (Dkt. 16). On February 20, 2020, the Hon. Michael A. Telesca entered a Decision and Order denying Defendants' motion to dismiss. (Dkt. 23).

Following Judge Telesca's death in March of 2020, the matter was reassigned to the undersigned. (Dkt. 26). Discovery closed on November 13, 2020. (Dkt. 40).

The instant motions for summary judgment were filed on February 1, 2021. (Dkt. 45; Dkt. 46). The Court entered a Scheduling Order requiring that responses be filed by March 2, 2021, and that replies by filed by March 16, 2021. (Dkt. 47). Plaintiff filed his response to Defendants' summary judgment motion on March 2, 2021. (Dkt. 51). However, Defendants filed a motion seeking an extension to March 22, 2021, to file their response, which motion the Court granted over Plaintiff's objection. (Dkt. 48; Dkt. 49;

Dkt. 51; Dkt. 52).  Despite having been granted this extension, Defendants did not file a response to Plaintiff's summary judgment motion, nor did they file a reply in further support of their motion for summary judgment.

## DISCUSSION

**I**.   **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*,

781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).   Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown*, 654 F.3d at 358.   Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## II.   <u>The Parties' Motions</u>

In considering competing motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002).  Having performed such an evaluation, the Court concludes, for the reasons set forth below, that both sides (albeit to varying degrees) have committed the same fatal error in seeking summary judgment—they have failed to construe the evidence in the light most favorable to their opponent.  Accordingly, both pending motions for summary judgment must be denied in their entireties.

A.     **Fourth Amendment Unreasonable Seizure Claim**

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]"   U.S. Const. amend IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996).   However, "[t]he Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985).  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810.   Once a lawful traffic stop based on probable cause has occurred, a police officer may make "ordinary inquiries incident to the traffic stop," and "[t]ypically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (alterations omitted).

While the existence of probable cause justifies the stop of a vehicle and the attendant ordinary inquiries, it does not give a law enforcement officer *carte blanche* to detain the occupants of a vehicle for an extended period of time.  To the contrary, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois*

*v. Caballes*, 543 U.S. 405, 407 (2005); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").  However, a law enforcement officer may extend a traffic stop where he develops reasonable suspicion of criminal activity.  *See United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018).  Of course, an arrest without probable cause is an unreasonable seizure in violation of the Fourth Amendment.  *See Williams v. City of New York*, 683 F. App'x 57, 58 (2d Cir. 2017) (individuals have a Fourth Amendment right "to be free from unreasonable seizures, including arrest without probable cause").

Here, it is undisputed that probable cause existed for the initial stop of the vehicle, inasmuch as Blauvelt, the driver of the vehicle, was not wearing a seat belt, in direct violation of New York's vehicle and traffic law.  (*See* Dkt. 50 at 5 (Plaintiff agrees that Flaitz pulled over the vehicle because Blauvelt was not wearing his seatbelt)).  Instead, Plaintiff claims that (1) Flaitz lacked reasonable suspicion to prolong the traffic stop to inquire into Plaintiff's immigration status and (2) Defendants lacked probable cause to arrest Plaintiff.  (*See* Dkt. 50 at 12).

In order to properly consider these issues, some background matters of immigration law must be set forth.  "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012)  ("[U]nlike illegal entry, mere unauthorized presence in the United States is not a crime.").  Because merely being present in the United States without lawful status is generally not a crime, "possible removability"

does not provide an appropriate "predicate for an arrest[.]" *Arizona*, 567 U.S. at 407.  So, for example, an individual who merely overstays his or her visa has generally not committed a crime, but only a civil violation.  *See Melendres,* 695 F.3d at 1001 ("[U]nlawful presence need not result from illegal entry. For example, an individual may have entered the country lawfully, but overstayed his or her visa.").  On the other hand, it is a criminal act to unlawfully enter the United States.  *See* 8 U.S.C. § 1325(a).

1.   <u>**Genuine Issues of Material Fact Exist as to Whether Flaitz had Reasonable Suspicion to Continue the Traffic Stop**</u>

With these principles in mind, the Court turns to the issue of whether Flaitz had reasonable suspicion to prolong the traffic stop.  The Court considers first Plaintiff's contention that, construing the evidence in the light most favorable to Defendants, no reasonable jury could conclude that such reasonable suspicion existed.  In support of this argument, Plaintiff asserts that at the time he issued the traffic tickets, Flaitz knew only the following information regarding Plaintiff: "1) he was from Mexico; 2) he was not a native English speaker; 3) his identifying information, specifically his full name, New York State address, and date of birth; and 4) that he had a driver's license but was not carrying it on his person."  (Dkt. 45-1 at ¶ 19 (internal citations omitted)).  However, this recitation of the information known to Flaitz ignores the fact that during his sworn interrogation on July 27, 2017, Flaitz indicated that while asking Plaintiff and Aguilar-Valdez for their identification, he also asked them "how they came to the United States" and "they could

not provide any information to that fact."  (Dkt. 45-18 at 6)[1].  At his deposition in the instant matter, Flaitz testified that his statements made during the sworn interrogation were accurate.  (Dkt. 46-3 at 32).

As discussed more fully below in the context of Defendants' request for summary judgment, the Court agrees with Plaintiff that if Flaitz was aware only that Plaintiff was from Mexico, was a non-native speaker of English, and did not have identification on his person, he did not have reasonable suspicion of illegal activity and could not lawfully prolong the traffic stop.  However, accepting as true Flaitz's representation that he asked Plaintiff how he had come to the United States and that Plaintiff was unable to provide any information in that regard—as opposed to Plaintiff's representation that he simply refused to provide such information—changes the calculus.  *See United States v. Tehrani*, 49 F.3d 54, 59 (2d Cir. 1995) (reasonable suspicion existed that defendant had unlawfully entered the United States where, despite having "unhesitatingly identified himself" and produced a Canadian citizenship card, he was "unable to explain how or where he entered the country" and his answers to questions were inconsistent with his traveling companion, whom officers reasonably suspected of unlawful entry); *Contreras v. United States*, 672 F.2d 307, 308 (2d Cir. 1982) (affirming dismissal of claims based on allegedly unlawful

---

[1]     The Court does not understand Plaintiff to be contending that Flaitz violated the Fourth Amendment by merely asking him questions about his identity, nor could he successfully do so.  "[Q]uestions relating to the identity of a passenger are routine and ordinary inquiries incident to a traffic stop and, in any event, are permissible considering the inherent dangerousness of traffic stops." *United States v. Hicks*, No. 18-CR-6041CJS, 2018 WL 6595934, at *7 (W.D.N.Y. Dec. 14, 2018).

arrest of the plaintiff because her "unfamiliarity with English, <u>her attempt to avoid</u> <u>questioning about her entry from Guatemala into the United States</u>, her nervousness, her resemblance to the informer's description, and the corroboration of details of the anonymous tip [that 'three persons living in a third-floor apartment in Brooklyn were illegal aliens']" constituted probable cause that she had unlawfully entered the United States) (emphasis added)).  Plaintiff's failure to meaningfully address Flaitz's claim that Plaintiff was unable, when discussing his identity, to provide any explanation for how he had come to the United States from Mexico, is a fatal flaw in Plaintiff's request for summary judgment as to this aspect of his Fourth Amendment claim.  The Court cannot say, on the record before it, that a reasonable jury would be compelled to conclude that Flaitz lacked reasonable suspicion to extend the traffic stop.

On the other hand, Defendants' contention that they are entitled to summary judgment on this aspect of Plaintiff's Fourth Amendment claim is entirely without merit. Defendants argue that Plaintiff's statement that he was from Mexico and his failure to have identification on his person constituted "reasonable suspicion, if not probable cause" of criminal activity.  (Dkt. 46-1 at 9).  This position is wholly inconsistent with longstanding case law.

First, the Supreme Court held nearly 50 years ago that an individual's Mexican heritage does not justify a "reasonable belief" that he or she is in the country illegally. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975); *see also Whren*, 517 U.S. at 810 (race is a "decidedly impermissible factor[]" on which to base a traffic stop); *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005) ("[R]ace, when considered by itself

and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop."); *United States v. Salter*, 521 F.2d 1326, 1328 (2d Cir. 1975) ("[T]he number of Mexicans who have been legally admitted or have become American citizens renders Mexican accent or appearance insufficient as an indicator of illegal entry[.]").

Second, failure to have identification on one's person is also not evidence of unlawful conduct. Accepting as true Plaintiff's statements that he had his seatbelt on at all relevant times and that he freely provided Flaitz with his name, address, and date of birth, his inability to produce an identification document could not give rise to reasonable suspicion of criminal activity. *See Brown v. Texas*, 443 U.S. 47, 52 (1979) (the "guarantees of the Fourth Amendment" will not tolerate "demanding identification from an individual without any specific basis for believing he is involved in criminal activity").

Taken to its logical conclusion, Defendants' argument would mean that American citizens who were born outside the United States are obliged to carry identification papers on their person at all times, and that the failure to do so constitutes a reasonable basis to believe that that they are engaging in criminal activity. This conclusion is not only manifestly inconsistent with decades of Supreme Court precedent, it is repugnant to the Constitutional guarantee of equal protection under the law. Defendants cannot demonstrate that, taking the evidence in the light most favorable to Plaintiff, they are entitled to summary judgment on Plaintiff's claim that Flaitz lacked reasonable suspicion to extend the traffic stop.

The Court also easily dispenses with Defendants' contention that they are entitled to qualified immunity on this claim. "Qualified immunity is an affirmative defense that

the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citation omitted).  As the Second Circuit explained in *Coollick*:

> [A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.

*Id*. (quotation omitted).

Defendants' argument that they are entitled to qualified immunity turns this standard on its head.  Defendants contend that "to defeat qualified immunity, Plaintiffs [sic] must show that his conduct violated rights that were clearly established as of June 29, 2017," and that "[t]he burden is on Plaintiffs [sic] to show cases with similar facts where a court found a constitutional violation."  (Dkt. 46-1 at 14).  This is not an accurate statement of the law regarding the burden at this stage of the proceedings, and Defendants have failed to make any meaningful, substantive argument regarding the state of law on June 29, 2017, or what a rational jury could find regarding the same.

Moreover, in denying Defendants' motion to dismiss, Judge Telesca expressly considered and rejected their contention that they were entitled to qualified immunity.  (Dkt. 23 at 14-19).  Defendants have failed to identify any undisputed facts developed in discovery that would change this conclusion, and have indeed not even acknowledged Judge Telesca's earlier ruling.  "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Buehlman v. Ide Pontiac, Inc*., 345 F. Supp. 3d 305, 309 (W.D.N.Y. 2018) (citation

omitted).  Defendants have failed to come forward with any basis for the Court to revisit its prior conclusion regarding qualified immunity.[2]

For all these reasons, the Court finds that no party is entitled to summary judgment on Plaintiff's claim that Flaitz violated his Fourth Amendment rights by prolonging the traffic stop to inquire into Plaintiff's immigration status.

### 2.      Genuine Issues of Material Fact Exist as to Whether Defendants had Probable Cause to Arrest Plaintiff

Turning to Plaintiff's arrest, the critical issue with respect to this aspect of Plaintiff's Fourth Amendment claim is whether Defendants had probable cause to believe Plaintiff had illegally entered the United States.  Fatally to the parties' competing motions for summary judgment, this issue turns on disputed issues of material fact, including (1) whether Plaintiff told Flaitz that he was in the United States illegally and (2) whether Leon-Gonzalez told Flaitz that Plaintiff was an illegal entrant into the United States.

Plaintiff's motion for summary judgment addresses the first of these disputed facts, but not the second.  In particular, Plaintiff acknowledges that Flaitz claims that Plaintiff "told him he was 'in the country illegally' during the traffic stop" (Dkt. 45-1 at 24), but argues that (1) this statement should be disregarded by the Court because it "contradicts every other piece of evidence in the record, including Flaitz's own prior sworn statements" (*id*. at 25) and (2) in any event, "such an admission does not give probable cause to believe that he committed a crime" (*id*. at 26).

---

[2]      The fact that the prior decision was issued by a different district judge does not change the fact that it constitutes the law of the case.  *See DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992).

However, Plaintiff does not make any similar arguments in his motion for summary judgment regarding Flaitz's testimony, given at both his sworn interrogation and his deposition, that Leon-Gonzalez advised him that Plaintiff and Aguilar-Valdez were illegal entrants.  (*See* Dkt. 45-18 at 7; Dkt. 46-3 at 48).   Plaintiff does argue, in opposition to Defendants' motion for summary judgment, that CBP records show that CBP "did not ascertain [Plaintiff's] immigration status until after he was arrested, when he was processed at the Rochester Border Patrol Station."  (Dkt. 50 at 20-21).   However, those records are not sufficiently clear to preclude a rational jury from crediting Flaitz's claims regarding his conversation with Leon-Gonzalez.   In particular, the CBP records indicate that while speaking with Flaitz, Leon-Gonzalez "determined that both subjects [Plaintiff and Aguilar-Valdez] were illegally present in the United States" (Dkt. 45-7 at 4), but are silent on what, if anything Leon-Gonzalez relayed to Flaitz regarding Plaintiff's immigration status.

The Court must, in assessing Plaintiff's request for summary judgment, assume that a jury would believe Flaitz's statement that Leon-Gonzalez told him Plaintiff was an illegal entrant.  That same jury could then rationally conclude that Defendants had probable cause to arrest Plaintiff.  *See Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (arresting officer may rely on information provided by other officers in making probable cause determination).   Accordingly, the Court cannot grant summary judgment in Plaintiff's favor as to his claim that he was arrested without probable cause.

Nor can the Court grant summary judgment to Defendants.  Defendants' argument that probable cause existed for the arrest cannot bear even modest scrutiny.  Rather than construing the evidence in the light most favorable to Plaintiff, Defendants have taken as

true Flaitz's assertion that Plaintiff told him he was in this country unlawfully. (*See id*. at 11). Indeed, Defendants have included as a paragraph in their statement of undisputed facts an assertion that Flaitz "obtained statements" from Plaintiff and Aguilar-Valdez "that they were here in the country illegally." (Dkt. 46-2 at ¶ 11). Defendants further take as true Flaitz's assertion that Leon-Gonzalez told him that Plaintiff was an illegal entrant (*id*. at ¶ 12), despite the fact that Plaintiff maintains and has identified evidence that this is not the case.

Defendants fail even to acknowledge that Plaintiff denies the veracity of Flaitz's account, much less to offer any basis for the Court to grant summary judgment in light of these clear factual disputes. In particular, Defendants have not demonstrated that Flaitz had probable cause to believe that Plaintiff had illegally entered the United States absent these disputed factual assertions by Flaitz. Defendants' misapprehension of the summary judgment standard permeates their probable cause argument and precludes entry of summary judgment in their favor.

Nor have Defendants demonstrated they are entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claim based on his arrest. In arguing for summary judgment on this basis, Defendants have failed to distinguish between Flaitz's prolongation of the traffic stop and the subsequent arrest. Accordingly, the Court's above analysis of the qualified immunity issue applies with equal force to this aspect of Plaintiff's Fourth Amendment claim.

In sum, and for all these reasons, the Court finds that no party is entitled to summary judgment as to any aspect of Plaintiff's Fourth Amendment claim.

- 22 -

## B.    <u>Fourteenth Amendment Equal Protection Claim</u>

The Fourteenth Amendment states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend XIV.   Here, Plaintiff is asserting an equal protection claim based on a "selective enforcement" theory.   Accordingly, to prevail on his equal protection claim, he must show that "(1) compared with others similarly situated, he was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure him."   *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 35 (2d Cir. 2014) (alterations omitted).

As to the first of these prongs, the Court finds that there are genuine issues of material fact precluding entry of summary judgment in Plaintiff's favor.   In particular, the parties' dispute over whether Flaitz observed Plaintiff not wearing his seatbelt is directly relevant to this aspect of Plaintiff's equal protection claim. As Plaintiff correctly notes, Flaitz could not recall at his deposition a single other instance in which he had asked a passenger for identification after stopping a vehicle because of a traffic infraction by the driver. (Dkt. 50 at 22; *see* Dkt. 46-3 at 15).   However, Flaitz also testified that it was his general practice to ask a passenger for identification where that passenger was not wearing a seatbelt.   (Dkt. 46-3 at 15).   On this record, the Court cannot decide whether Plaintiff was selectively treated compared to others similarly situated, because a resolution of that issue

turns on whether Plaintiff was wearing his seatbelt when Flaitz first observed him.  A jury must resolve this disputed fact.

There are also genuine issues of material fact regarding whether Flaitz was improperly motivated by race.  Flaitz flatly denied that Plaintiff's race, ethnicity, or nationality played any role in his conclusion that he had probable cause to believe Plaintiff was an illegal entrant.  (Dkt. 46-3 at 70 ("Q. Mr. Flaitz, just a few more questions.  When you see a Latino person, do you think that they are likely to be an illegal immigrant?  A. Absolutely not.  Q. Okay, Would you say it's more likely that this person is an illegal immigrant than a white person? A. Absolutely not.  Q.  Okay.  So you would treat them the same way in a traffic stop.  Is that correct?  A. Absolutely."), 71 ("Q. Did the fact that [Plaintiff] was speaking Spanish contribute to your belief that he was an illegal entrant? A. Absolutely not.  Q. Did his race? A. Absolutely not.")).  While the Court agrees with Plaintiff that Flaitz's social media activity is indicative of anti-immigrant sentiment and racial animus against Latinos, it is not the function of this Court to weigh that evidence against Flaitz's testimony; a jury must make that determination.

Defendants' argument that they are entitled to summary judgment on Plaintiff's equal protection claim has no merit on its face.  Defendants contend that Plaintiff's equal protection claim must fail because Plaintiff has not shown "that someone of another race or national identity committed the same violation they [sic] did, but was not stopped by Trooper Flaitz."  (Dkt. 46-1 at 12).  Defendants' argument utterly ignores the fact that, construing the evidence in the light most favorable to Plaintiff, Plaintiff did not commit any traffic violation at all.  In other words, while Flaitz claimed at his deposition that

Plaintiff was not wearing his seatbelt when Flaitz first observed him (Dkt. 46-3 at 17), there is ample evidence of record from which a jury could find to the contrary, including Plaintiff's sworn statement that he was wearing his seatbelt the entire time he was in the vehicle (*see* Dkt. 45-2 at ¶ 8). To accept Defendants' argument in this regard would require the Court to resolve disputed issues of fact in favor of Defendants, in complete contravention of the standard to be applied on a motion for summary judgment. Defendants have proffered no other basis in support of their request for summary judgment on Plaintiff's equal protection claim, and so it must be denied.

## **CONCLUSION**

For the foregoing reasons, the parties' competing motions for summary judgment (Dkt. 45; Dkt. 46) are denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      May 13, 2021
            Rochester, New York